We'll now move on to the next argument today. That's Freeman et al versus HSBC Holdings et al. Counsel, let me make sure you're here. Mr. Raven Hansen. Can I say it right? Raven or Raven? It's Raven Hansen. Like in the bird. Got it. Okay. Mr. Raven Hansen, you're here and you can see and hear already? Yes, I can. Good. And Mr. Pincus? Yes. Good morning, Your Honors. You can see and hear me and your adversary and the other judges on the panel? Yes. Good. All right. So, Mr. Raven Hansen, you reserve two minutes of rebuttal, so that gives you eight out of the gate. The floor is yours. You may proceed. Thank you very much and may it please the Court. I represent the appellants here, the plaintiffs below, the Freeman plaintiffs in this case appealing the dismissal of against all of the defendants and an aiding and abetting claim under JASTA against Standard Chartered Bank. Every defendant in this case, except the specially designated global terrorist bank, SATARAT, has admitted to criminally conspiring with their Iranian counterparts to launder U.S. dollar transactions using deceptive techniques, the kinds of deceptive techniques that the United States government has found enabled Iran to fund terrorism and proliferation. The District Court held that the complaint did not plausibly allege a JASTA conspiracy, and in doing so, the Court made three errors under the governing legal framework of Halberstam v. Welch, which Congress has mandated as the framework for JASTA liability. First, in Halberstam, Linda Hamilton, the defendant, was held liable for murder, although she agreed only to launder loot, in Judge Wald's phrase, with the knowledge that something illegal was afoot. She had no intent to commit murder, no intent even to commit burglary, and none is required for civil conspiracy. But here, the District Court held that the plaintiffs had to plead a predicate criminal conspiracy with an intent to benefit a terrorist organization, and that was error and inconsistent with the Halberstam framework. Well, can I ask you a question about Halberstam? I mean, Halberstam, very different facts, obviously. But the conspiracy is, you know, is a burglary, right? It's a conspiracy to engage in a burglary. No, Your Honor. I'm sorry, I shouldn't go. Go ahead. It's not a conspiracy to commit a burglary or to engage in a burglary. It was a conspiracy to involving some personal property crime at night, and that's as far as the Court went. It said there was no intent to Well, I mean, the point is that the killing was deemed to be an overt act in furtherance of the agreement, right? This is what the Court said. The only remaining issue is whether Welch's killing of Halberstam during a burglary was an overt act in furtherance of the agreement, right? That's the language of Halberstam. And so I guess the question then here is, how are the terrorist acts, the 92 acts, overt acts in furtherance of the agreement here? What is the agreement here, and how does a terrorist attack advance that agreement? It's a reasonably foreseeable consequence of the agreement. And in Halberstam, the Court at page 487 said that the liability for conspiracy laid for the unplanned murder because she had entered into an agreement involving a personal property crime at night and was a reasonably foreseeable consequence that violence might take place. Right, but the requirement is that the overt act be in furtherance. That's a point made again and again, done pursuant to and in furtherance of the common scheme. Well, Your Honor, at page 484, Judge Wald expressly addresses that point. She says, in furtherance of, pursuant to, within the scope of, or foreseeable from, is there any practical difference in these terms? And her answer was, no, there is no practical difference because they're all ways of getting at the concept of foreseeability. Here, the violence that is the use of laundered funds for illicit activities that would result in terrorism is a foreseeable consequence of an agreement to launder them. Recall here that the defendants and Iran had the ability to obtain funds lawfully under the U-turn regulations, including their oil revenues. But they chose, in this conspiracy with the defendants, to conceal the destination of the funds so that they could fund illicit activities that they couldn't otherwise fund transparently. When you're doing that and you have been on notice from the United States government that your Iranian counterparts are funneling money to terrorism, then a foreseeable consequence of your money laundering is that some of the funds, at least, will be used for terrorism. And when I mention notice, I'm sorry. Well, I was going to say, again, it's just hard for me to see how overt act in furtherance of simply means foreseeable to. And that's your position. Do I have that right? It is my position, Your Honor, but I think that's also the Halberstam position and something that Judge Wald addressed explicitly at page 484. All right. Well, I don't want to take up all your time. I know there's other points you want to get to, so go ahead. I had mentioned the knowledge that the defendants had, and I should complete that thought. In mid-2006, the Undersecretary for Terrorism and Financial Intelligence went to each of 40 international banks. And we know it includes at least three of the defendants here as paragraphs 30 and 31 of the complaint note, and warned them that Bank Satirat was using deceptive practices to funnel money to EZBOLA, a foreign terrorist organization that jointly committed the attacks at issue. And we know the bank got the message, because if you look at paragraph 518 of the complaint, the compliance officer for HSBC then emailed the staff saying the United States government has, quote, direct evidence, close quote, that Bank Satirat is funding EZBOLA and suspects that all Iranian state-owned banks are involved in terror financing. After you have that warning from the government, if you engage in any deceptive practice on behalf of Bank Satirat or another Iranian state-owned bank, then you have noticed that there is a substantial risk, if not a certainty, that the money you launder will be used for terror financing. That's a foreseeable consequence, and I believe that Halberstam requires no more. The lower court also required the defendants to plead that, I mean the plaintiffs to plead that the defendants had conspired directly with a foreign terrorist organization that committed the attacks here. And it said the plain text of JASTA required that. Of course, there is no plain text that says directly the word that JASTA uses is conspires. And the Supreme Court has said when Congress uses the word conspires, it intends to use all the principles of ordinary conspiracy law. And those principles do not require that each conspirator conspire or from a conspiracy law that, first of all, doesn't exist in conspiracy law and certainly doesn't exist in the words of JASTA. Nor does JASTA require that the conspiring be with the foreign terrorist organization that committed the attack. And that's clear just from looking at the threshold requirement, which is that a foreign terrorist organization either authorize, plan, or commit the attack so that it contemplates the situation in which a foreign terrorist organization merely authorizes the attack, but the defendant conspires with the entity that committed it, which is here the IRGC, the Iranian Revolutionary Guard Corps. Furthermore, we allege at paragraphs 420 to 423, based again on U.S. government findings, that the IRGC used Bank Melly, among others, to access funds that it couldn't transparently legally access and that it then channeled funds to a Shiite militia who actually targeted the coalition forces that are the plaintiffs here. So, clearly, the IRGC is a member of the conspiracy. It's using Bank Melly. Bank Melly is the common Iranian bank that all of the Western banks conspired with to create deceptive practices that Melly then used to channel money to Shiite militia who committed the attacks. I see my time is up. All right. Well, you've got two minutes for rebuttal. So, we'll hear from Mr. Pincus for 10 minutes, and then we'll come back to you. Thank you, Mr. Redding. Mr. Pincus? Good morning, and may it please the court. This is one of a number of cases in which violations of sanctions laws have been claimed to be sufficient to establish an ATA violation, and the court in prior cases has refused to premise ATA liability on sanctions law violations, and it should reach the same result here. The conspiracy claim fails for three separate reasons. First, the statutory text, as the district court held, requires proof that the JASTA defendant interacted with the terrorist attackers, and there's no plausible allegations of that interaction here. Second, there's no plausible allegation that the defendants joined a conspiracy to engage in terroristic acts. And third, defendants are therefore plausibly alleged only to have joined a conspiracy to avoid sanctions laws and can't be liable for the as Judge Sullivan's question was asking, those attacks are not acts in furtherance of that sanctions avoiding conspiracy. And maybe I'll pause, put to one side for a moment our argument about the statutory text and direct interaction, and go to these questions of what was the agreement and were these acts in furtherance because the court asked some questions about those. The district court found that the allegations don't plausibly support defendant's agreement. That defendants agreed to the objective of engaging in terroristic acts. Rather, as the district court held, it plausibly alleged only that they have agreed to a sanctions avoiding conspiracy, which is defined in the key graph of the complaint, paragraph 22, which lists the banks and other businesses as members of the conspiracy. The end of that paragraph does say, and I want to quote it, that those entities serve as financial and logistical conduits for the IRGC and its terroristic activities, but it doesn't say that the IRGC was a member of the conspiracy. This case, therefore, is a lot like the Kemper case in which Judge Wood, speaking for the Seventh Circuit, said the facts here suggest only that Deutsche Bank, which was the defendant there, may have engaged in business dealings that incidentally assisted a separate terrorism- related conspiracy involving Iran. They do not suggest that Deutsche Bank ever agreed to join that conspiracy, and my friends on the other side say that that decision is irrelevant because it was assessing whether the predicate criminal conspiracy was satisfied, but here Halberstam itself says that whether or not an alleged conspirator agreed to the objective is based on a common intent at page 480, and other civil conspiracy cases have the same test. We cite some at our briefs at page 34, and the Business of Ecos brief cites some more at page 19. Now, plaintiffs also rely on... I'm sorry, Judge Brown. I'm having problems hearing you. Yeah, I think you're muted, Gary. We are all having problems. Judge Brown, I can't hear you. Well, Judge Brown, let's get this so you can communicate. Is it worth dialing back in? We don't hear. Seems... No. No. Why don't we try to have you dial back in, Judge Brown? We'll take a minute. Go ahead. Yeah. It's got to be the snow. The iPad could be on mute. It seemed like he was turning mute on and off, and it wasn't altering. That's the mute on the Zoom, but it could be that there could be a mute on the iPad itself. But we've heard it before, so... Yes, yeah. Courtroom deputy, if she can give us any guidance as to what's going on. Thank you, Judge. I'm talking to assistants right now, and I'm letting them know. Great. All right. I won't distract you. Thanks. You're welcome. Are we good? Are we back in? Hello? Ah, we're back. Can you hear me now? Yes. I don't know what happened there. I apologize for that. So, counsel, the question, I hope it's good enough, worth the wait. Um, my question is this. When you suggest that we should construe the allegations as actually alleging two separate conspiracies, given that we're at the Rule 12 stage, and we're supposed to construe everything in favor of the non-movement, is that the appropriate way to approach it? I mean, can we actually construe it as a banking conspiracy and a separate terrorism conspiracy, given the stage we're at? Well, whether or not you technically have to construe them as separate conspiracies, I guess I think the critical hurdle that the plaintiffs have to get over is alleging facts that plausibly support the defendant's agreement to the objective of engaging in terroristic acts. In order for — there are two possible objectives here, right? Engaging in terroristic acts, if they could plausibly allege that, then there probably wouldn't be much of a debate that the terroristic acts were in furtherance of that goal. If all they've alleged is an agreement to engage in sanctions avoiding conspiracy, then we think there's a very strong argument that the terroristic acts are not in furtherance of that goal, and that in furtherance is the proper standard. So I think the critical question is whether they've plausibly alleged agreement to the goal, maybe not separate or joint. But I think that's what Judge Wood was getting at in her decision for the Seventh Circuit, was that while there was an allegation about a sanctions-avoiding conspiracy, there was no agreement to the goal of terroristic acts. And that's our fundamental submission here. Okay, thank you. I was saying, in addition to that argument, the other side relies on NIOC, the National Iranian Oil Company, and says that that entity was found to be an agent or affiliate of the IRGC, which is an Iranian military entity, and that therefore interactions with NIOC were sufficient to show the defendant bank's agreement to the terroristic goals. The problem with that is that the U.S. government designation they rely on happened in 2012, after all of the attacks in this case, and its text says it's based on 2011 information, which is, again, late. And so we don't think that they can rely on that designation. And there's no other facts alleged in the complaint to support the idea that somehow dealing with NIOC was sufficient to show that the defendants were agreeing with the terroristic goals, which, of course, are not the goals of NIOC, but allegedly are the goals of the IRGC. So there, too, it's sort of one step removed. And the claim alleges an alternative business reason for the sanctions-avoiding conspiracy, which is to profit and promote business relationships. And I point the court to the allegations in paragraphs 44, 534, 951, and 992 of the complaint, which make that point. So because the complaint doesn't plausibly allege that the defendants joined a conspiracy to engage in terroristic acts, but rather only the sanctions-avoiding conspiracy, the overt act has to be in furtherance of that sanctions-evasion conspiracy agreement, and they're not. The principal submission of the other side is not to say that they meet the in furtherance test, but that the test is foreseeability. And we discuss on pages 39 and 40 the many different times that Judge Wald, writing for the Halberstam Court, said that the test was in furtherance and not foreseeability. And at 485, Judge Wald specifically says, I'm not deciding whether in furtherance and foreseeability could be the same, because I don't have to do that in this case. If this could conceivably meet the in furtherance test, then we would have no logical stopping point for liability, certainly in the banking context. Any entity providing services to an Iranian government agency or state-owned business that violated any law would be liable for all injuries to all U.S. victims of terror. And the bank amicus brief, the trade association amicus brief, explains why that kind of broad liability would be quite harmful for the banking system and actually drive transactions underground where they'd be harder to find. And we think that's a reason why the statute shouldn't be interpreted in that broad way. I'd like to, if I may, return to the argument that I put to one side, which was what the district court found, which is that the text of the statute, which imposes conspiracy liability on a person who, quote, conspires with the person who committed the act of international terrorism, requires interaction between the JASTA conspiracy defendant and the person who committed the acts. We think that statutory text plainly does. There's a good reason for that. Congress was expanding from primary liability to secondary liability, and it wanted, and certainly the Supreme Court has noted in Central Bank and other cases that secondary liability can be a trap for the unwary. So here Congress wanted to specify something that would put businesses on notice. If you're dealing with a terrorist attacker, then you are going to be liable. That's going to be a threshold test. I should say that's also consistent with Halberstam, which at page 481, not only there, obviously, were the conspirators in direct contact, but the court said in assessing whether there's a conspiracy shown, the court, and I'm quoting, must initially look to see if the alleged joint tortfeasors are pursuing the same goal, although performing different functions, and are in contact with one another. So Halberstam says that. My friends on the other side argue that that's inconsistent with the purpose language that Congress included in JASTA, but we think that's wrong. Congress did talk about direct and indirect liability. We think that means primary liability is direct, and it was creating secondary liability, which is indirect. They also rely on some language in the Purpose Clause that talks about broadest possible basis of liability, but we think that language quite clearly is designed to refer to personal jurisdiction, which was a concern of Congress because many of these entities are foreign, and not the underlying liability standard, because the phrase says, and I'm quoting, to provide civil litigants with the broadest possible basis consistent with the Constitution of the United States to seek relief against persons, entity, and foreign countries wherever acting and wherever they may be found. So we think that's quite clearly a reference to personal jurisdiction, which is also addressed in the findings in the prior subsection, notably six and seven, and we think that doesn't really have anything to do with the scope of liability, and it certainly can't override the statutory text. Finally, if I may, just a word about aiding and abetting. The district, the aiding and abetting claim was only raised on reconsideration. The district court noted that, and it gave that as one of its reasons for declining to address aiding and abetting liability, but the aiding and abetting liability claims for numerous, fails for numerous reasons, which we detail in our brief. Didn't the court address it nevertheless? It did go on to address it in a cursory way, Your Honor. I think it gave both reasons. We think this court could rest its decision on the fact that it wasn't timely raised, but if the court wanted to go on to address it, it could. It's important to note that the court in its subsequent decision dealing with some of these parties that my friends on the other side cite, Freeman Bowman decision of June 5th, 2020, in footnotes one and six, the district court reaffirms that there was no aiding and abetting claim here. But if the court wants to go on and address the aiding and abetting claim, it has three flaws. First of all, the aiding and abetting argument also requires providing assistance to the person who committed the terroristic attack. Siegel didn't address that issue, but I think it's critical to note that Halberstam itself, at pages 487 to 88, says that the party that the defendant aids must perform the wrongful act that causes the injury. Second of all, there's the knowing requirement, as the Siegel case explained. That means that the alleged aiding and abetting defendant has to be aware that by providing banking services, it was supporting the terrorist group and also assuming a role in the terrorist group's violent activities. Here, for the reasons I've discussed, we don't think that comes close to being satisfied. And finally, the six Halberstam substantial assistance factors aren't satisfied here. The nature of the act encouraged. There's no allegation that Standard Chartered Bank encouraged any terroristic acts. In that way, this case is very much like Siegel. The assistance given, there's no allegation that these particular transactions funded these activities. And indeed, as the district court noted, these entities, the government itself and state-owned entities have legitimate operations. There's no allegation that Standard Chartered Bank was present at the offense. Standard Chartered Bank was remote from the principal violator, multiple steps along the way. And there's no allegation that Standard Chartered Bank knowingly assumed some role in terrorism. So we think for all those reasons, the aiding and abetting claims, if the court decides to address them, should fail. All right, thank you. Thank you. We'll now hear from Mr. Raven Hansen for two minutes everybody. Thank you. Mr. Pincus says that the standard of intent here is an intent to engage in terrorist acts. And there is no suggestion in Halberstam that there was a need to intend to engage in murder. And in fact, if the standard for JASTA liability was an intent to engage in terrorist acts, it's hard to imagine any bank that would qualify. And yet it was material support that Congress had in mind when it enacted JASTA. When it said in its purpose statement that providing material support directly or indirectly, it wasn't referring to the nature of the liability, it was referring to the nature of the material support. And so clearly for banks that provide support through their Iranian counterparts, they could violate JASTA without intending to commit the terrorist act itself. Secondly, the furtherance requirement, let me summarize what Halberstam ultimately says about liability from page 487. It says, in sum, the district court's findings that Hamilton agreed to participate in an unlawful course of action and that Welch's murder of Halberstam was a reasonably foreseeable consequence of the scheme are a sufficient basis for imposing tort liability on Hamilton according to the law on civil conspiracy. And that's what we have here. We think it's a foreseeable consequence after you've been warned by the United States that Bank Sateret and your other Iranian counterparts are using deceptive practices to funnel money to a foreign terrorist organization, Hezbollah, that it's a foreseeable consequence. At least at the pleading stage, it's a reasonable inference from that warning that the money is going to be used in part by Hezbollah for its terrorist activities. All right, but again, Halberstam says on that same page, the purpose of the act must advance the overall object of the conspiracy. So how do the terrorist acts here advance the overall object of this conspiracy, one alleged in this complaint? They are a foreseeable consequence and a result of the conspiracy in the same way that the Grimm case is, which Halberstam cites favorably for conspiracy theory. In Grimm, a 13-year-old conspired to enter a church to steal soft drinks. Unknown to him, some of his co-conspirators carried torches to light the way. When they left, they put them out, but they were unsuccessful and embers caught fire to the church. He was held liable for the fire to the church, even though he didn't know that they were using the torches and they certainly didn't further the conspiracy. Torches clearly furthered the conspiracy. Torches enabled them to carry out the crime, right? Not the fire, though. The question is here, did the terrorist acts further the conspiracy? And the question there is, does the fire further the conspiracy to steal soft drinks? The fire is not an act. The fire is a result of an act, which was the use of a torch. And that's what he was held liable for, Your Honor, the result. And here we are suggesting liability for the result of terror financing, which is that some of the funds would be used for a terrorist act. It was not foreseeable that, I mean, I'm sorry, it was not intended or pursuant to the conspiracy to steal soft drinks that they would set fire to the church, but the court viewed it as a foreseeable consequence. Here it's even more foreseeable that when you are laundering money for a bank that's a conduit to Hezbollah, as you were told by the Secretary of Treasury or the Deputy Secretary of Treasury, that some of that money would be used for terrorist acts. Finally, with respect to aiding and abetting, the court did agree to construe these claims under the JASTA aiding and abetting of page 108 of the Special Appendix. It says so. And it then held that there was no proximate causation on the grounds that some of the banks or Iranian instrumentalities with whom the defendants dealt also had legitimate functions and none of them existed solely for terrorist purposes. It thus misapplied Rostein versus UBS to an aiding and abetting claim. In an aiding and abetting claim, the first question is whether the primary tortfeasor has approximately caused the injury. And there's no reasonable dispute here that the IRGC working with Hezbollah and Shiite militia approximately caused the injury. Then the issue is, did the aider and abetter get substantial assistance? And here, certainly the amount and the nature of the act qualifies as substantial assistance. But let me focus on the relationship that Standard Chartered Bank had to the terrorists in the end and to their Iranian intermediaries. At paragraph 624, they loudly, proudly say, we are being invited to act effectively as the treasurer to the Central Bank of Iran in laundering these funds. It's not an arms-length correspondent banking relationship they have. They're working hand-in-glove to launder funds for activities that Iran could not transparently finance. That's terrorism and proliferation. And they did so and they continue to do so after having received the warning from the Department of the Treasury. They are one of the three defendants who we know from paragraph 31 actually were in that meeting and were told that Iranian banks were involved in terror financing and using deceptive practices to that end. On those circumstances, it's surely a reasonable inference at the pleading stage that they were aware of their role in funding money to Hezbollah via bank satire. And we are at the pleading stage. We've had quotes in the defendant's briefs of Lindy versus Arab Bank and others that would set standards they say we can't meet. But Lindy was decided after a six-week trial and full discovery and a full trial record. We are at the 12B6 stage here and any reasonable inference should have been drawn in our favor. And the district court violated the basic pleading rules by refusing to do so and drawing the opposite inference. Let me just finish with one further point, if I may, Your Honor. All right. Well, listen, I mean, you're five over. So let's wrap it up. Go ahead. In Rothstein versus UBS, this court ended the opinion by saying, of course, it's Congress's prerogative to create aiding and abetting liability and to specify the elements thereof, including mens rea. They exercise that prerogative here and they specify the elements by specifying Halberstam versus Welch as the controlling authority. And Halberstam does not require intent. It does not require direct interaction. And it does hold liability for reasonably foreseeable consequences of the unlawful agreement towards the defendant acted. Thank you. All right. Thank you both. Very well argued. We will reserve decision.